IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| DAVID GOTT, JR., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 15-253-GMS |

**MEMORANDUM**

**I.  INTRODUCTION**

On March 22, 2011, plaintiff David Gott ("Gott") filed for disability insurance benefits ("DIB") under Title II, 42 U.S.C. §§ 401-433, and for supplemental security income ("SSI") under Title XVI, 42 U.S.C. §§ 1381-1383f. Gott asserted that he had become disabled as of January 1, 2009. His claim was denied initially and upon reconsideration. He timely requested a hearing, which was held on January 20, 2012. The Administrative Law Judge ("ALJ") issued a partially favorable decision on July 31, 2013, finding that Gott was disabled for a closed period between January 6, 2012 and May 8, 2013, but not prior to, or after that period. The Appeals Council declined Gott's request for subsequent review on January 22, 2015. Having exhausted all administrative remedies, Gott filed a complaint with the court seeking review pursuant to 42 U.S.C. § 405(g) on September 18, 2015. (D.I. 11.) The Commissioner of Social Security Administration ("the Commissioner") timely answered on October 21, 2015, (D.I. 14), and cross-

moved for summary judgment on the same date. (D.I. 13.) Because the court finds that the ALJ's decisions were supported by substantial evidence as addressed below, it will deny the plaintiff's motion and grant summary judgment in favor of the Commissioner.

## II. BACKGROUND

Gott alleges that he has been unable to work since January 1, 2009. At the time of the administrative hearing, he had visited multiple physicians for steadily increasing back and shoulder pain. (D.I. 12 at 2–4.) By December 2011, he had undergone multiple cervical epidural steroid injections, which did not meaningfully lessen his pain. (*Id.* at 2–3.) Dr. Devotta, who administered the injections, noted that he received relief, but did not keep up with the treatment. (D.I. 7 at 418.) At that point, Dr. Bikash Bose M.D. recommended he undergo a series of three surgeries, the first of which occurred on January 6, 2012 and the last of which occurred on May 8, 2013. (*Id.* at 3–4.) In the June 19, 2013 administrative hearing, Gott testified that he was discharged from the hospital on either May 11, 2013 or May 12, 2013 and that, while he was no longer in pain management, he was receiving Percocet for his pain from Dr. Bose. (*Id.* at 45.) The ALJ noted that Gott's depression was successfully managed by taking antidepressants. (*Id.* at 47.) She asked Gott's counsel for updates and progress notes post-surgery and was told that she would be able to get them in about two weeks. (*Id.* at 48.) On July 31, 2013, the ALJ released her decision currently in dispute. (*Id.* at 11.)

### A. Medical History

#### 1. Dr. Lifrak's Assessments

In June 2011, Dr. Lifrak performed a consultative physical examination of Gott. (D.I. 7 at

2

395–99.) Dr. Lifrak noted, in pertinent part, that Gott had reduced range of motion in his lumbosacral spine and both shoulders, (*id.* at 398), and diagnosed him with degenerative joint disorder and possible disc damage, possible obstructive pulmonary disorder, and bipolar disorder, noting a prior suicide attempt. (*Id.* at 398.) He concluded Gott could stand for up to four hours and sit for up to six hours in an eight-hour workday. He also found that Gott could lift up to ten pounds regularly, but would have difficulty lifting above his shoulders. (*Id.* at 398–99.) He did not make any note of Gott's prior MRIs in his determination. (*Id.* at 395–399.)

### 2. Dr. Kurz's Assessments

In June 2011, Dr. Kurz performed an examination of Gott's mental capacity. He diagnosed him with Mood Disorder, Not Otherwise Specified. (D.I. 7 at 401.) He opined that Gott had moderate impairments in his activities of daily living, personal habits, and interests; moderate limitations in coping with the pressures of ordinary work; and mild limitations in carrying out instructions, sustaining work performance and attendance, and performing routine, repetitive tasks under supervision. (*Id.* at 401–02.) Ultimately, he found no evidence of thought processing disorders, determined Gott had "generally intact" cognitive skills, and recommended no further treatment. (*Id.* at 406–07.) He noted that Gott said his medication was effective in stabilizing his mood. (*Id.* at 404–05.)

### 3. Assessments of Dr. Bose

Dr. Bose examined Gott on December 29, 2011, and noted that Gott was not experiencing extended relief from either physical therapy or his epidural shots. (D.I. 7 at 441–42.) On the basis of motor weakness, balance issues, and findings of spinal cord compression, he recommended

3

surgery pending the results of a subsequent spinal CT scan conducted on January 6, 2013. (*Id.* at 441.) On May 13, 2013, five days after Gott's final surgery, Bose noted in his follow-up visit that the surgical incision was clean and dry and made no comments on continuing pain or follow-up treatment besides removing the staples from the surgery site. (*Id.* at 511.)

### 4. Assessments of Dr. Borek

In June 2012, Dr. Borek assessed Gott's medical record and evaluated Dr. Lifrak's findings. (D.I. 7 at 141–43.) Dr. Borek was a non-examining state agency doctor. (*Id.* at 143.) Borek concluded that Dr. Lifrak's examination relied "heavily on the subjective report . . . provided by the individual," that Gott's statements were "partially credible," and that Lifrak's conclusions were "without substantial support from other evidence of record," rendering them less persuasive. (*Id.* at 140, 143.) He examined the April 2011 MRIs and noted that the pain such an injury would produce "is not consistent with the degree of total disability reported." (*Id.* at 138.) He further determined as a non-examining state agency doctor that based on the medical record, Gott was capable of performing light work. (*Id.* at 145.)

### 5. Assessments of Dr. King

On July 6, 2011, Dr. Christopher King (a psychologist) performed a consultative examination and noted Gott's report of emphysema, arthritis, rotator cuff problems, and bipolar disorder. (D.I. 7 at 137.) Dr. King noted his 2009 MRI showing shoulder issues and radiating pain to his fingers. (*Id.*) He noted Gott had no history of lumbar complaint, had full strength in his legs and normal gait, and found Gott's reporting of disability only partially credible. (*Id.* at 138.) He also concluded Gott was capable of performing light work. (*Id.*) Examining Dr. Kurz's

4

file, he noted that Gott's medications were effective at stabilizing his moods and that he had a GAF score of 65 and his mental impairment was not severe. (*Id.* at 138–39.) He believed Gott was capable of routine work and that, consistent with the evidence from Dr. Kurz's examination, his depression did not limit his ability to perform in the workplace. He concluded Gott was not disabled. (*Id.* at 138.)

### B. ALJ's Findings

On July 31, 2013, after applying the regulatory five-step sequential evaluation process, the ALJ issued her decision. (D.I. 7 at 12–23.) At step one, she determined Gott was not performing substantial gainful activity. (*Id.* at 16.) At step two, she found that his cervical and lumbar degenerative disc disease status post-surgeries, his erthropathies (joint disease), tobacco use, and obesity were all severe impairments. (*Id.*) At step three, she determined his impairments were not listing-level severe. (*Id.*) In concluding he was disabled from January 6, 2012 to May 8, 2013, the ALJ found that he had not developed any new impairment(s) since the day of his surgery, and that as of that date there was an increase in Gott's Residual Functional Capacity assessment (the "RFC"). (*Id.* at 17, 21, 21.) To support her decisions she cited the April 2011 MRIs as well as the examinations and opinions of Drs. Borek, Bose, King, and Kurz, while explaining why she afforded less weight to the conclusions of Dr. Kurz specifically. (*Id.* at 15–20.)

Relying on the medical evidence above, the ALJ found that from the alleged onset date of January 1, 2009 to January 5, 2012 and again after May 8, 2013, Gott retained the RFC to perform light work. (*Id.* at 21.) She found that Gott was unable to perform any past relevant work and, relying on the VE's testimony, she found he could perform other work in the national economy.

5

(*Id.* at 22.) The ALJ further concluded from examining the medical record that Gott's mental health issues were non-severe and did not amount to more than a mild impediment in his daily living and socialization or a moderate impairment in his concentration and persistence. (*Id.* at 59, 22.) The ALJ asked the VE about the availability of light work of a kind accommodating Gott's particular physical and mental limitations and the VE testified to jobs complying with those parameters. (*Id.* at 58–60.) Ultimately, the ALJ found that Gott was disabled only between January 6, 2012 and May 8, 2013, noting that "the medical evidence of record" established Gott was limited by his impairments, "but not to the degree alleged" for the periods before January 6, 2012 and following May 8, 2013. (*Id.* at 23.)

## III. STANDARD OF REVIEW

### A. Review of an Agency Decision

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) (stating "[w]here the ALJ's findings of fact are supported by substantial evidence, . . . [the court is] bound by those findings, even if . . . [it] would have decided the factual issue differently"). "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d

6

Cir. 1988). Thus, substantial evidence may be slightly less than a preponderance. *See Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

In considering evidence supporting an agency's decision, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Fargnoli*, 247 F.3d at 44 n.7. Moreover, "a single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

### B. Harmful Error

In appealing an agency ruling, "the party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *see also Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014) ("the burden of showing that an error is harmful falls on the party attacking the agency's ruling."). Consequently, in certain scenarios a plaintiff will need to allege more than just the presence of legal error in the Agency's evaluation to win relief. "Often the circumstances of the case will make clear . . . that the ruling, if erroneous, was harmful and nothing further need be said. But, if not, then the party seeking reversal normally must explain why the erroneous ruling caused harm." *Shinseki*, 129 S. Ct. at 1706.

### C. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit. *Boyle v. Cty. of Allegheny*

7

*Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.*; *see also Assaf v. Fields*, 178 F.3d 170, 173-74 (3d Cir. 1999).

## IV.  DISCUSSION

Gott seeks review of the ALJ decision pursuant to 42 U.S.C. § 405(g). He asserts that the ALJ's conclusion lacked substantial evidence to support: (1) fixing May 9, 2013 as the end date of his disabilities; (2) fixing January 6, 2012 as the onset date of his disabilities; (3) failing to reconcile Gott's eventual RFC with the findings of examining-doctor Lifrak; and (4) failing to conduct a Psychiatric Review Technique ("PRT") to account for his mental illnesses in the final RFC as required by law.

### A.  Applicable Statute and Law

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See id.* at § 404.1520(a). The process is summarized as follows:

8

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."
2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."
3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."
4. If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."
5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not he or she is capable of performing other work in the national economy. If he or she is incapable, a finding of disability will be entered. Conversely if the claimant can perform other work, he will be found "not disabled."

*Cunningham v. Apfel,* No. 00-693, 2001 WL 1568708, at *4 (D. Del. Dec. 7, 2001) (citing 20 C.F.R. § 404.1520(b)-(f) (2000)) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Secretary of Health & Human Servs.,* 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *See Sykes v. Apfel,* 228 F.3d 259, 263 (3d Cir. 2000); *see also Kangas v. Bowen,* 823 F.2d 775, 777 (3d Cir. 1987); *Olsen v. Schweiker,* 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that - (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. § 423 (d)(1)(A), (2)(A); *Heckler v.*

9

*Campbell,* 461 U.S. 458, 460 (1983). After step three but before step four, the Commissioner assesses the claimant's residual functional capacity, which is then used in steps four and five. 20 C.F.R. § 404.1520(a)(4).

The ALJ determined that, in the periods between January 1, 2009 and January 5, 2012, and after May 9, 2013, Gott had the residual functional capacity to perform light work. (D.I. 7 at 21.) She reached these conclusions without explicitly addressing the contrary opinions of Dr. Lifrak. (*Id.* at 17–18.) Without conducting a PRT, she concluded his depression was not a severe impairment. (*Id.* at 16.) This dispute centers on whether the ALJ's conclusions in her RFC assessment were nonetheless supported by substantial evidence in the record.

### B. The Disputed Findings

#### 1. The May 9, 2013 End Date

Gott first contends that the ALJ's conclusion that he reached the RFC to perform light work beginning May 9, 2013 was not supported by substantial evidence. To justify a determination of a disability period's end date, the Commissioner "must determine whether the claimant had medical improvement that increased the capacity to perform basic work activities." 20 C.F.R. §§ 404.1594(b)(1), (f), 416.994(b)(1), (f). A "medical improvement" is "any decrease in the severity of [ ] impairment[s]" demonstrated by "changes (improvement) in the symptoms, signs, and/or laboratory findings." §§ 404.1594(b), 416.994(b).

Gott's counsel insists the full record of evidence reduces the ALJ's reasoning to "a giant inferential leap." (D.I. 12 5.) He asserts she was obligated to seek further evidence of Gott's improvements, since the burden fell on her to show he was "able to engage in substantial gainful

10

activity before [his] benefits [were] stopped." 20 C.F.R. § 404.1594(b)(5); (D.I. 15 at 3). He characterizes the ALJ's query for additional progress notes as her simply asking "how long it will take to get the file completed" instead of a pointed demand for additional evidence. (*Id.* at 2.) He also notes that Gott testified that Dr. Bose prescribed him Percocet after his surgery. (D.I. 7 at 45.)

The court is not convinced. The ALJ faced no obligation to continue to pursue additional records after the hearing. This is so because in termination hearings the burden falls on the recipient to "introduce evidence that his or her condition remains essentially the same as it was at the time of the earlier determination." *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 308 (3d Cir. 2012). While she did not explicitly cite them in her holding, the record also makes clear that during the June 19, 2013 proceedings, the ALJ was told by Gott's counsel that follow-up treatment notes from Dr. Bose would be available in two weeks' time. (D.I. 7 at 48.) Yet, when she rendered her decision over a month later, no such records had been produced, supporting an inference that there were none. (*Id.*) Nothing in the record contradicts her conclusion that Gott regained the RFC to perform light work by May 9, 2013. Thus, although the ALJ did not expressly state this, nothing suggests the outcome would change had it been explicitly considered.

The ALJ reasoned that Gott regained the RFC to perform light work the day after his surgery. Her reasoning is supported by the fact that during a physical examination five days later, Dr. Bose saw no complications and made no comments of continuing pain. (*Id.* at 21.) The ALJ also noted that Gott underwent no additional surgeries or injections, "which is an indication that he has improved." (*Id.*) The singular undisputed piece of evidence to the contrary–Gott's Percocet use–does not undermine the court's conclusion that the ALJ's end date determination is supported

11

supported by substantial evidence. *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) ("Although substantial evidence is more than a mere scintilla, it need not rise to the level of a preponderance.").

## 2. The January 6, 2013 Onset Date

Gott contends that the medical record alone does not support setting a precise onset date. He argues the date must be inferred, and, as a result, the ALJ was obligated to "call upon the services of a medical advisor, rather than rely on [her] own lay analysis of the evidence." *See Walton v. Halter*, 243 F.3d 703 (3d Cir. 2001). An ALJ's determination of onset date must have a "convincing rationale." *Id.*; *see also* SSR 83-20, 1983 WL 31249 at *3. While an ALJ's determination may be upheld when there is "ample medical evidence" to support it, in circumstances where it must be inferred, the ALJ must rely on a medical expert. *Cf. Kirk v. Comm'r of Soc. Sec.*, 177 Fed. Appx. 205 (3d Cir. 2006) (holding that "because this case involves a relatively short time period regarding the proper onset date, and because there is ample medical evidence supporting the ALJ's conclusion, the decision not to call for yet another medical expert was not error.") *Id.* at 208; *see also* SSR 83-20 at *3. Gott points to the fact that Dr. Bose recommended surgery in December 2011, at least partly on the basis of afflictions he already suffered. (D.I. 7 at 440–41.) Gott also notes that April 2011 MRIs detected the underlying conditions precipitating the disability, that he had received three cortisone shots which Dr. Bose noted had not alleviated his pain, and that through that time, he rated his pain as 8 and 9 out of 10. (*Id.* at 421, 441, 413.) He contends six of the seven justifications offered by the Commissioner in her Reply Brief as either post-hoc rationalizations or misrepresentations of the record. (D.I. 15 at

12

4–5.)

Gott first points out the SSA's concession that three of the rationales enumerated in its Reply Brief were never asserted by the ALJ in the underlying decision. (D.I. 15 at 4.) Consequently, he contends, they must be disregarded as post-hoc rationalizations. (*Id.*) Gott notes the comment that his failure to follow through with his epidural injections "suggest[ed] his pain was not as severe as he reported" constitutes a fourth post-hoc rationalization, as it does not appear in the ALJ's final opinion. (*Id.*) He criticizes the ALJ's reliance on Dr. King's testimony because Dr. King is a psychologist who "issued no opinion as to Gott's functional capabilities." (*Id.*) Lastly he attacks the ALJ's reliance on Dr. Lifrak's evaluation because it was more restrictive than—and thus conflicted with—the eventual RFC determination. (*Id.*) In sum, he charges, the medical record does not clearly support the onset date reached.

The court disagrees. "The commissioner's denial . . . is to be upheld if supported by substantial evidence on the record as a whole." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360–61 (3d Cir. 2004). There, the Third Circuit found the Commissioner's fixation of an onset date was not supported by the record because claimant McCrea's statements regarding the nature and extent of her pain were supported by objective medical evidence. For example, her complaints of constant lower back pain were corroborated by June 22 1995 MRI testing of her lumbosacral spine showing herniated discs, which could have cause the reported pain. *McCrea*, 370 F.3d at 361. Here, by contrast, the record does not support Gott's statements; while his April 2011 MRIs showed shoulder and disc damage, Dr. Borek noted that the damage they displayed was not consistent with Gott's rating of his own pain. (D.I. 7 at 138.) Further, McCrea received steroid

injections from June 1995 to November 1997, supporting her claim. *McCrea*, 370 F.3d at 361. While Gott also received cortisone injections over the summer of 2011, the doctor who administered them noted that he received relief from them but did not follow through. (D.I. 7 at 418.)

Lastly, McCrea's self-assessments of her physical limitations were corroborated by objective findings of an examining physician. *McCrea*, 370 F.3d at 361. Although Gott's June 2011 self-assessment of his limited mobility is corroborated by Dr. Lifrak, that examination relied heavily upon Gott's testimony and did not incorporate or reconcile the MRIs or any other medical evidence in the record. (D.I. 7 at 395–99.) The Commissioner cites the summer 2011 conclusions of non-examining state agency Drs. King and Borek, which by contrast considered the prior objective medical evidence to determine he was capable of light work. (*Id.* at 138.) These doctors properly assessed the work capabilities of the claimant and the ALJ was entitled to give them at least some weight. *See* 20 C.F.R. § 404.1527(e)(ii) ("[T]he State agency disability examiner will consider the opinion of the State agency medical or psychological consultant as opinion evidence . . . .")

Unlike Dr. Lifrak's June 2011 analysis, Dr. Bose's December 2011 conclusions rely on more than Gott's self-assessment. Dr. Bose considered CT chest scans done in November 2011 and recommended surgery in January 2012, pending the results of a CT spinal scan conducted on January 6, 2012. (*Id.* at 441.) In light of Dr. Bose's analysis, the objective medical evidence present in late 2011 and early 2012, and the consistent opinions of Drs. King and Borek, the court finds the ALJ's determination of onset date was supported by substantial evidence in the record.

14

### 3. Contrary Evidence from Dr. Lifrak

Gott contends that the ALJ's failure to reconcile Dr. Lifrak's June 2011 assessment of his mobility against the contradictory conclusions of state agency doctors Borek and King was harmful legal error. "In determining claimant's residual functional capacity, for purposes of application for supplemental security income benefits, [the] administrative law judge is required to evaluate all relevant medical evidence and explain reasons for rejecting any such evidence." *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002). The court disagrees and finds legal error, but not harmful error.

First, the record makes plain that the ALJ completely ignored Dr. Lifrak's assessment. The assessment of an examining doctor clearly qualifies as "relevant medical evidence." *See Fargnoli v. Massanari,* 247 F.3d 34, at 40 (3d Cir. 2001). Yet her decision makes no attempt to reconcile the doctor's conclusions that Gott could neither lift more than 10 pounds nor stand for more than four hours in a workday with her contradictory finding that he could perform light work prior to January 6, 2012. (D.I. 7 at 12–23.) While Drs. Borek and King concluded that Dr. Lifrak's findings relied "heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion," the ALJ never adopted this reasoning or even mentioned it. (*Id.* at 143, 12–23.) Her failure to explain her reasoning was therefore legal error.

Nevertheless, the Commissioner posits that substantial evidence still supports the final RFC because it was consistent with the assessments made by Drs. Borek and King. (D.I. 14 at 17.) In response, Gott asserts that since neither physician directly examined Gott, their opinions

15

deserve less weight. (D.I. 12 at 7.) This is problematic, he contends, because the SSA must generally give more weight to examining sources against non-examining ones. *See* 20 C.F.R. § 404.1527(c)(1). Additionally, Gott notes that Dr. King is a psychologist, which should further reduce the weight of his opinion in accordance with SSA regulations. *See* § 404.1527(c)(2)(ii) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Nonetheless, Dr. Lifrak's conclusions appear less credible than Drs. Borek and King. Dr. Borek points out that the April 2011 MRIs—the only objective source in the record for establishing Gott's pain prior to surgery—do not substantiate his subjective pain ratings. Dr. Lifrak's June 2011 opinion does not reconcile this inconsistency. (D.I. 7 at 138.) In sum, then, the record as a whole supports the ALJ's reliance on Drs. Borek and King. In light of substantial evidence supporting the ALJ's decision, Gott's motion is denied in this respect.

### 4. Failing to Conduct a PRT

Gott lastly contends that the ALJ committed additional legal error in failing to conduct a mandatory PRT form and incorporate it into her final RFC. (D.I. 12 at 13–14.) When there is a suggestion of mental impairment in a case, SSA regulations require ALJs to assess a claimant's mental impairments pursuant to a special technique, called the PRT. 20 C.F.R. §§ 404.920a, 416.920a. The findings in the PRT are used in shaping the RFC. *See Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004). To avoid committing harmful legal error, an ALJ must pose hypothetical questions to the VE that "reflect *all* of a claimant's impairments." *Id.* at 554. Failing to specifically incorporate or conduct a PRT is not harmful legal error if the ALJ's findings later establish that

16

the claimant's "mental impairments were not disabling." *See Thompson v. Colvin*, 551 Fed. Appx. 944, 947–48 (10th Cir. 2014). While the court agrees that the ALJ committed legal error by failing to conduct a PRT, it does not amount to harmful error, because substantial evidence still supports the ALJ's eventual RFC with respect to Gott's mental capacities.

Firstly, there was substantial evidence in the record to support the ALJ's RFC determination that Gott's bipolar disorder was a non-severe impairment at step two. The ALJ considered the findings of examining physician Dr. Kurz and explained the weight she afforded it. (D.I. 7 at 16.) These findings, which assess his performance in the workforce as at most moderately impaired, are not contradicted by any other substantial medical evidence in the record. (*Id.* at 402–03, 407.) They are further consistent with Dr. King's conclusion as a state agency medical doctor that Gott was effectively treated by his bipolar medication and that the disorder was ultimately a non-severe impairment. (*Id.* at 138–39.)

Secondly, the failure to follow the PRT procedure does not seem to have prejudiced the ALJ's determination, given that the final RFC accommodates the limitations identified by non-severe bipolar disorder and draws upon the cited evidence in the record. The RFC declares Gott "can understand, remember and carry out simple routine entry level work and is able to concentrate and persist at that level of complexity given the work breaks customarily afforded in the competitive workforce." (D.I. 7 at 21.) It further credits the evaluations of Dr. King and comments that while the disorder was found non-severe, "the reports of concentration issues has [sic] been considered," thus justifying an assessment that Gott can "perform simple unskilled work." (*Id.* at 19.) In her hypothetical question to the VE, the ALJ noted that, as a result of no psychiatric therapy

17

records found, Gott had "mild limits in activities of daily living and socialization" as well as "moderate levels in concentration and persistence." (*Id.* at 59.) The VE responded by listing jobs which would fit these parameters, which the ALJ relied upon in her eventual RFC. (*Id.* at 22–23.) In light of these facts, it is clear that the ALJ's eventual RFC incorporated and relied upon substantial evidence from the record.

Lastly, the burden falls to Gott to prove that the procedural error of not conducting a PRT nevertheless caused him harm. *See Shinseki v. Sanders*, 556 U.S. 396, 413 (2009). In *Shinseki*, the Supreme Court dismissed an appellant's claim challenging the Veterans Court's unfavorable determination because "he has not explained . . . how the notice error to which he points could have made any difference." *Id.* at 413. As discussed above, nothing in the record suggests that the eventual RFC would change had the ALJ incorporated her assessment of Gott's mental capacities in the form of a PRT. Gott has offered no basis to conclude otherwise. Therefore, the court will deny Gott's motion in this regard.

## V. CONCLUSION

For the foregoing reasons, Gott's Motion for Summary Judgment (D.I. 11) is denied and the Commissioner's Cross Motion for Summary Judgment (D.I. 13) is granted.

Dated: July __15__, 2016

UNITED STATES DISTRICT JUDGE